**UNITED STATES of America, Appellee,**

**v.**

**Kenneth A. MANNING, Appellant.**

**No. 85–5281.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 18, 1986.

Decided March 28, 1986.

Rick Johnson, Gregory, S.D., for appellant.

David L. Zuercher, Asst. U.S. Atty., Pierre, S.D., for appellee.

Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and ARNOLD, Circuit Judge.

ARNOLD, Circuit Judge.

Kenneth Manning appeals from his conviction on two counts of taking or attempting to take migratory game birds by the aid of baiting in violation of the Migratory Bird Treaty Act, 16 U.S.C. § 703, and 50 C.F.R. § 20.21(i). For reversal, Manning argues that (1) the evidence was insufficient to establish his guilt beyond a reasonable doubt; (2) the government should be estopped to prosecute him for an activity which a government agent said was legal; (3) he was entrapped; and (4) the baiting regulation is unconstitutionally vague. After reviewing the record, we affirm the judgment of the District Court.[1]

## I.

In the fall of 1984, Kenneth Manning was in charge of the "Dean Hansen Goose Club," a commercial goose-hunting operation located on Dean Hansen's ranch near Pierre, South Dakota. The facilities of the Club include a number of pits or slit trenches dug into a bluff to provide cover to goose hunters, who pay a fee to hunt at the Club. This case centers on a field on Hansen's property located approximately three hundred to five hundred yards from the bluff pits used by the hunters.

On November 8, 1984, Agent John Cooper of the United States Fish and Wildlife Service walked the entire area of the field in question. He found no scattered ear or shell corn on the ground and nothing to indicate any game violations. Cooper was patrolling the area again on November 10, 1984, at about 5:00 p.m., when he noticed Canadian Geese landing in and around the field, and heard shooting which seemed to be coming from the area of the bluff pits. Several minutes later, he stopped a red van which contained Manning, nine hunters, and thirteen dead Canadian Geese. Cooper testified that Manning later told him the geese had been shot from the bluff pits. At trial, Manning denied that he had placed hunters in the bluff pits or that he told Cooper he had done so.

After Cooper talked briefly with the hunters in the van, he and Manning went on a tour of the field. During the tour, Cooper observed large numbers of geese feeding heavily in certain parts of the field. He also saw shell corn and ear corn scattered on the ground at irregular intervals. Because it was growing dark, Cooper told Manning he would return the following day. Cooper indicated that he believed the field had been baited with corn to attract geese. Manning denied that the field had been baited, insisting that the scattered corn was normal agricultural waste resulting from combining in the fields.

Cooper returned to the field on the morning of November 11 to conduct a more thorough inspection. He found shell corn and ear corn distributed along vehicle tracks in the field. Cooper maintained that none of the scattered corn had been in the field at the time of his November 8 inspection.[2] Manning appeared while Cooper was photographing the field, and Cooper asked him to explain the presence of the scattered corn. According to Cooper, Manning replied, " 'Well, that's just easy feed, Cooper. You know as well as I do these geese have got to have something to see.' " Cooper then asked if Manning was saying that he had put the corn there, to which Manning allegedly responded, " 'Well, I don't know who did it, but whoever did didn't do a very good job, did he? ... I guess you guys know in order to find the corn, all you got

---

1. The Hon. Donald J. Porter, Chief Judge, United States District Court for the District of South Dakota.

2. All combining in the field was apparently completed before November 8. There is no indication that any additional combining was done between November 8 and November 10.

to do is follow the geese and it appears[.]' " Cooper then cited Manning for violating 50 C.F.R. § 20.21(i), the regulation prohibiting the taking of migratory game birds by the aid of baiting.

On November 14, 1984, Manning asked Cooper to inspect the field again. As the two men walked through the field, Cooper noticed that the corn was gone and the geese were no longer present. In fact, Cooper saw very few geese in the field until December 6, 1984, when he observed approximately 1,200 to 2,000 geese near the center of the field. Cooper returned to the area on December 7, and saw 15,000 to 20,000 geese feeding heavily in the field. When he walked through the field, he saw corn scattered on the ground in much the same manner as it had been on November 11. On the morning of December 8, Cooper returned to the field again, and watched as Manning took twenty-four hunters to the bluff pits. Cooper observed the flight pattern of geese coming onto the field and saw the hunters shoot from the pits, bringing down three Canadian Geese. He located Manning and told him he believed the field had again been baited. Cooper then went back to the field to take photographs and collect samples of the scattered grain. Manning admitted that corn had been scattered in the field, but explained that it had been placed there to feed livestock which had been moved into the field in late November. Cooper gave Manning a second citation for violating the baiting regulation on December 8, 1984.

Manning was subsequently charged in a two-count information with taking or attempting to take Canadian Geese by the aid of baiting.[3] Following a bench trial in February 1985, the District Court entered a verdict of guilty on both counts. This appeal followed.

## II.

Section 703 of Title 16 makes it unlawful for any person "at any time by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, ... any migratory bird[.]" However, the statute allows the Secretary of the Interior to prescribe exceptions to this general prohibition, and the Secretary has promulgated regulations which permit the taking of migratory birds in limited and specific circumstances. The regulation at issue here, 50 C.F.R. § 20.21, provides in pertinent part:

Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No person shall take migratory game birds:

\* \* \* \* \* \*

(i) By the aid of baiting, or on or over any baited area. As used in this paragraph, "baiting" shall mean the placing, exposing, depositing, distributing, or scattering of shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed so as to constitute for such birds a lure, attraction or enticement to, on, or over any areas where hunters are attempting to take them; and "baited area" means any area where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed whatsoever capable of luring, attracting, or enticing such birds is directly or indirectly placed, exposed, deposited, distributed, or scattered; and such area shall remain a baited area for 10 days following complete removal of all such corn, wheat or other grain, salt, or other feed. However, nothing in this paragraph shall prohibit:

(1) The taking of all migratory game birds, including waterfowl, on or over standing crops, flooded standing crops (including aquatics), flooded harvested croplands, grain crops properly shocked on the field where grown, or grains found scattered solely as the result of normal agricultural planting or harvesting; and

---

**3.** Manning was not carrying a gun on either of the dates in question, and the government's case against him was based on a theory of aiding and abetting. See 18 U.S.C. § 2.

(2) The taking of all migratory game birds, except waterfowl, on or over any lands where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed has been distributed or scattered as the result of *bona fide* agricultural operations or procedures, or as a result of manipulation of a crop or other feed on the land where grown for wildlife management purposes[.]

■ In order to convict Manning for violating this regulation, the government had to prove beyond a reasonable doubt (1) that the field in question was baited; and (2) that Manning aided, abetted, coerced, or induced another to take a Canada Goose by the aid of baiting or on or over a baited area.

### A.

Manning first argues that the evidence was insufficient to establish his guilt beyond a reasonable doubt. Specifically, he challenges the evidence supporting his conviction on Count I, the charge based on his November 10, 1984, activities.

■ When reviewing challenges to the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences which may be drawn from the evidence. The District Court found the evidence of Manning's guilt on Count I to be "almost overwhelming," emphasizing, among other things, Cooper's discovery on November 10 of scattered corn in a field under Manning's control[4] after finding no corn in the same field two days earlier, and Manning's statement to Cooper that the hunters had been shooting geese from the bluff pits.

In addition, the trial court found Manning's November 11 statement that the scattered corn was "easy feed" and that "geese have got to have something to see," to be an admission that the corn on the ground was bait placed there to bring geese within the range of the hunters.

In support of his argument that the evidence was insufficient to sustain his conviction, Manning points out that Cooper never actually saw hunters shoot from the bluff pits on November 10, nor did the government produce any witnesses who claimed to have been hunting in the bluff area on that date. In contrast, two defense witnesses testified that they were hunting at the Club on November 10, and that the hunters were all placed on a "bottom field" far from the baited area. In addition, Manning himself denied putting any hunters in the bluff pits that day, or telling Cooper that he had done so.

■ The District Court acknowledged that conflicting evidence had been presented, but found Cooper's version of events credible and rejected the contrary accounts. Such credibility determinations by the trial court are entitled to special deference. *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Certainly the trial court's findings are "plausible in light of the record viewed in its entirety," and they should therefore not be rejected as clearly erroneous. *Id.* Viewed in the light most favorable to the government, the evidence was sufficient to support a verdict that Manning was guilty of aiding and abetting hunters in taking migratory birds over a baited area on November 10, 1984.[5]

---

**4.** It is undisputed that Manning directed, participated in, or knew about all agricultural work on the land. In any event, it is not necessary to prove that a defendant violated the Migratory Bird Treaty Act with specific intent or guilty knowledge. *See Rogers v. United States,* 367 F.2d 998, 1001 (8th Cir.1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 976, 17 L.Ed.2d 874 (1967). Defendants may be held liable for violating the baiting regulation even without knowing that bait was in the field. *See, e.g., United States v. Chandler,* 753 F.2d 360, 363 (4th Cir.1985); *Unit-*

ed States v. Catlett, 747 F.2d 1102, 1104 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). *But see United States v. Delahoussaye,* 573 F.2d 910, 912 (5th Cir.1978).

**5.** It is not clear whether Manning is also challenging the sufficiency of the evidence as to Count II. In any event, ample evidence supports his conviction on this count as well.

## B.

Manning next argues that the government should be estopped to prosecute him for the December 8, 1984, violation of the baiting regulation. He points out that Cooper held a public meeting in October 1984, at which he stated that goose hunting was permitted over land where there was a *bona fide* livestock feeding operation.[6] Manning maintains that the corn Cooper found scattered on the ground in December 1984 was placed there not as bait, but as feed for livestock which had been moved into the field. He contends that the government is therefore prosecuting him for an activity which a government agent said was legal.

As the District Court noted, Manning's actions did not fall within either of the exceptions to the baiting regulation. Section 20.21(i)(2) allows the taking of migratory game birds over land where corn has been "scattered as a result of *bona fide* agricultural operations or procedures." However, subsection (2), by its own terms, excludes waterfowl from the scope of the exception, and Canadian Geese are waterfowl as that term is used in the baiting regulation. Section 20.21(i)(1) allows the taking of waterfowl over land where grain is scattered "*solely* as the result of normal agricultural *planting or harvesting*" (emphasis added). However, in light of Manning's assertion that the corn was scattered in the field in order to feed livestock and not as the result of planting or harvesting, this exception is also inapplicable.

Manning argues that he acted in reliance on Cooper's October statements, whether those statements were accurate or not. But even if Manning's actions were based on inaccurate information provided by Cooper, the government is not estopped to enforce the regulation in this instance. To begin with, both the Supreme Court and this Court have left open the question of whether the doctrine of equitable estoppel can be applied against the federal government. *See, e.g., Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); *I.N.S. v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 283–84, 74 L.Ed.2d 12 (1982) (per curiam); *McDermott v. United States,* 760 F.2d 879, 882 (8th Cir.1985). It is well-established, however, that the government is not subject to estoppel on the same terms as other litigants. *Heckler,* 104 S.Ct. at 2224; *I.N.S. v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973) (per curiam). The Supreme Court has indicated that even if equitable estoppel is applicable against the government, a showing of "affirmative misconduct" is necessary. *I.N.S. v. Miranda,* 459 U.S. at 17, 103 S.Ct. at 282; *I.N.S. v. Hibi,* 414 U.S. at 8, 94 S.Ct. at 21. *See also McDermott,* 760 F.2d at 882; *Free Enterprise Canoe Renters Association v. Watt,* 711 F.2d 852, 857 (8th Cir.1983) (in the absence of affirmative misconduct, the government may not normally be estopped by misrepresentations or misinformation given by its agents).

In the present case, the District Court found that Manning had failed even to demonstrate that the traditional elements of an estoppel were present.[7] And, indeed, it is questionable whether Manning acted in reasonable reliance on Cooper's statements, since Manning admitted that Cooper made it clear at the October meet-

---

**6.** The parties apparently agree that the gist of Cooper's statement at the meeting was that "feeding livestock in standing corn was not a violation of the baiting regulation, but feeding livestock in an area where there is a commercial goose hunting operation could be a violation, depending on whether or not it was a *bona fide* feeding operation or whether the grain was actually being just put out there with the excuse of livestock being in the area."

**7.** The District Court found that Manning had not changed his position for the worse in reliance on Cooper's statements, since both goose hunting and cattle feeding had been conducted on Hansen's property in previous years, and did not commence solely because of what Cooper said. Nor did the District Court find it reasonable for Manning to rely on Cooper's October statements in allowing corn to be scattered in the field in December, after having been cited for scattering corn in a similar manner in November.

ing that scattering corn on the ground is considered baiting. But even assuming that the traditional elements of an estoppel were present, Cooper's statements, while arguably misleading or inaccurate, did not rise to the level of "affirmative misconduct." *Cf. Heckler*, 104 S.Ct. at 2226 (erroneous advice from a fiscal intermediary is insufficient to raise an estoppel); *Schweiker v. Hansen*, 450 U.S. 785, 789–90, 101 S.Ct. 1468, 1471–72, 67 L.Ed.2d 685 (1981) (per curiam) (possibly erroneous replies to oral inquiries did not amount to ·"affirmative misconduct"). Therefore, the District Court properly rejected this claim. A different question would be presented if Cooper had deliberately misled Manning.

### C.

Manning further contends that his conviction on Count II should be set aside because Cooper's actions with respect to the December 8, 1984, violation constituted entrapment as a matter of law. Manning's argument is that, after telling him in October that *bona fide* livestock feeding operations were exempt from the baiting regulation, Cooper decided in December that corn scattered in Hansen's field as feed constituted baiting. Cooper then "lay in wait" on December 8, allowing a number of Canadian Geese to be killed or wounded before citing Manning.

▆▆ The entrapment defense is based on the assumption that Congress did not intend to punish an individual who has committed all the elements of an offense as the result of inducement or instigation by government agents. *United States v. Lard*, 734 F.2d 1290, 1292 (8th Cir.1984). The key question is "whether the government agent caused or induced the defendant to commit a crime he was not otherwise predisposed—*i.e.*, willing and ready—to commit whenever a propitious opportunity arose." *Id.* at 1293 (citations omitted). Here, it cannot be said that Cooper engaged in the kind of conduct which would persuade an otherwise innocent person to commit a criminal offense. Not only did Manning admit that Cooper told him in

October that scattering corn on the ground constituted baiting, but Manning's own statements and actions in November 1984 indicated a clear predisposition to violate the baiting regulation. Manning's entrapment argument is without merit.

### D.

Finally, Manning contends that the baiting regulation is unconstitutionally vague both on its face and as applied to him. Similar challenges to the constitutionality of the regulation have been raised in other cases and have been uniformly rejected. *See e.g., United States v. Brandt*, 717 F.2d 955, 957–58 (6th Cir.1983); *United States v. Delahoussaye*, 573 F.2d 910, 912 (5th Cir.1978); *United States v. Jarman*, 491 F.2d 764, 766 (4th Cir.1974).

Manning's attack in the present case seems to be directed primarily at the term "baited area" and, more specifically, at Cooper's application of the so-called "zone of influence" rule to determine that Manning permitted hunting within the scope of a baited area on December 8, 1984. The zone-of-influence rule is apparently not a formal, published rule, but a means of ascertaining or describing in practice the extent of a baited area in a given case. Cooper testified that he learned about the rule during a training course, and that it required him to make judgment calls about the scope of a baited area based on common sense and his observation of such factors as the flight patterns of birds. Manning complains that the rule is so vague and uncertain that it permits arbitrary enforcement of the baiting regulation. Manning further contends that the bluff pits where he placed the hunters on December 8 were too far from the corn Cooper found scattered in the field to support a finding that geese shot from the pits were influenced by the bait.

▆▆ The term "baited area" plainly means that area within which and over which scattered bait exercises an attraction. *Delahoussaye*, 573 F.2d at 912. The extent of that area "is defined only by the capacity of bait placed anywhere within it

to act as an effective lure[.] ... Congress must have intended for the violation to turn on the factual determination that birds are being lured to a hunter's shooting location, no matter how far the bait is from that location[.]" *United States v. Chandler*, 753 F.2d 360, 363 (4th Cir.1985). The extent of such an area is thus not subject to exact definition, and will vary depending on such factors as wind and terrain. There may, therefore, be "dubious zones at the area's edges[.]" *Delahoussaye*, 573 F.2d at 912. However, the fact "[t]hat there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States v. Petrillo*, 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). Here the term "baited area" is as exact as the subject matter permits. *See id.* at 7–8, 67 S.Ct. at 1542. *See also Yandell v. United States*, 550 F.Supp. 572, 576 (N.D.Miss. 1982), *aff'd*, 712 F.2d 218 (5th Cir.1983). The regulation is not impermissibly vague.

 Nor does it appear that Agent Cooper applied the regulation in an impermissibly arbitrary manner. Cooper determined that the geese were taken within the zone of influence of the bait based on his firsthand observations and his eleven years of experience as a Special Agent for the Fish and Wildlife Service. Cooper testified that he saw few geese in the field when no corn was there, whereas thousands of geese came into the field when the scattered corn was present. He observed the flight pattern of the geese on December 8, watched them come into the area of the field containing scattered corn, and saw hunters shoot them from the bluff pits. The evidence thus supports the conclusion that the corn acted as an effective lure for the geese, and that the geese were taken within the "zone of influence" of the bait. Therefore, Manning's challenge to the constitutionality of the regulation as applied is also without merit.

### III.

The District Court committed no error in determining that Manning violated the baiting regulation in both November and December of 1984. While there is no scienter requirement to mitigate the indefiniteness of the term "baited area" or the "zone of influence" concept, we agree with the Fourth Circuit that it would defeat the purpose of the statute to establish any arbitrary spatial limitation, *see Chandler*, 753 F.2d at 363. Accordingly, the judgment of the District Court is affirmed.