ARMSTRONG, Judge.
Defendant law firm, Deutsch, Kerrigan & Stiles (hereinafter “DKS”), appeals from a trial court judgment in favor of plaintiff, Fidelity Bank & Trust Company (hereinafter “Fidelity”), on a suit to recover the amount of a check for which Fidelity gave DKS a provisional settlement, and which was later returned by Fidelity because of insufficient funds in the drawer’s account. We affirm.
DKS maintained an office in Slidell, Louisiana. One of its Slidell customers was Fidelity. DKS handled real estate closings, collection matters and other legal affairs for Fidelity. DKS maintained several accounts with Fidelity, including a notarial account which it used in connection with real estate transfers.
In October, 1984, DKS was engaged to handle an exchange of two parcels of real estate between Raymond Crochet, Inc. (hereinafter “Crochet”) and its owner, Raymond Crochet, Sr. In connection with that *993 exchange, certain liens had to be satisfied. At the closing, Crochet tendered a check to DKS in the amount of $30,698.00 which was deposited in the DKS notarial account at Fidelity after 2:00 P.M. on Thursday, November 1, 1984. Because the check was received after regular banking hours, it was considered as having been deposited on the following day, Friday, November 2nd. The Crochet check was drawn on a Fidelity account.
At the Crochet closing DKS issued checks drawn on its notarial account with Fidelity. On November 5, 1984, after determining that the check would cause an overdraft in Crochet’s account, Fidelity decided to charge back the amount of the check to the DKS notarial account. The amount of the check was charged back to the notarial account, and the instrument itself was returned to DKS. DKS maintains that Fidelity is statutorily liable for the face amount of the check because it failed to return it before midnight, November 5th. Fidelity maintains that it complied with its statutory duty and returned the check by its “midnight deadline.” Because DKS has refused to pay the amount of the check, Fidelity instituted this action.
The matter was submitted to a Civil District Court Commissioner who resolved it in favor of Fidelity. Based upon the report of the Commissioner the trial court rendered a judgment in favor of Fidelity.
On appeal DKS claims that the trial court erred by (1) departing from the mainstream of commercial jurisprudence in the United States which, it maintains, holds that the failure of a bank to meet its midnight deadline under these facts renders it strictly liable for the face amount of the instrument, and (2) by finding that the placement of a returned check in a location in the bank where DKS employees picked up correspondence from the bank-as-client to DKS-as-attorney, satisfied the statutory requirements for returning the check.
Title 10 of the Louisiana Revised Statutes, designated as “Commercial Laws”, governs this banking matter. The various provisions of Title 10 track, for the most part, the Uniform Commercial Code.
La.R.S. 10:4-301 provides in pertinent part:
(1) Where an authorized settlement for a demand item, other than a documentary draft, received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment and before its midnight deadline it
(a) returns the item; or
(b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.
[[Image here]]
(4) An item is returned:
(a) as to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with its rules; or
(b) in all other cases, when it is sent or delivered to the bank’s customer or transferor or pursuant to his instructions.
La.R.S. 10:4-302 provides in pertinent part:
In the absence of a valid defense such as breach of a presentment warranty, settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of
(a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline;....
La.R.S. 10:4-301 prescribes the time limits within which a payor bank must take action if it receives an item payable by it, and La.R.S. 10:4-302 sets forth the rights of the customer if the payor bank fails to *994 take the action required within the time limits prescribed. See Uniform Commercial Code Comment to Section 4-302.
Under La.R.S. 10:4-302 the Crochet check is a “demand item other than a documentary draft,” and Fidelity is a “payor bank”. See La.R.S. 10:4-104(f); La.R.S. 10:4—105(b); Starcraft Company v. C.J. Heck Company of Texas, Inc., 748 F.2d 982 (5th Cir.1984).
DKS maintains that La.R.S. 10:4-302 provides for strict liability of a payor bank to its customer when it fails to take the action required within the time limits prescribed. It cites a number of other jurisdictions which apply a rule of strict liability in such cases, and argues that a similar rule should be applied in Louisiana, where appellate courts have apparently not yet addressed this issue. However, because we find that Fidelity properly returned the check in question, we need not address the issue of strict liability.
Before addressing the dispositive issues in this case we will examine the claim by DKS that the Commissioner, and implicitly the trial court, erred in refusing to consider as evidence of Fidelity’s failure to properly return the check, a statement made by a Fidelity employee. At the hearing before the Commissioner, Patrick J. Berrigan, the resident partner and manager of the DKS Slidell office, related a statement made by a Mr. Scott at a meeting before, according to Berrigan, the “entire Board.” Mr. Berrigan was asked “when are you going to pay your money,” and somewhere during the ensuing discussion Mr. Scott uttered, “I don’t think we did it the right way or gave them timely notice.” In his report the Commissioner characterized the meeting, correctly we feel, as one “called to attempt a compromise” of the problem concerning the Crochet check and its charge back to the DKS notarial account.
DKS seeks to have this statement considered as evidence that Fidelity missed its midnight deadline and is liable to it for the face amount of the check. We find no merit to defendant’s position. It is well settled that compromise discussions, such as the one at issue, are not admissible in evidence for the purpose of establishing liability. Louisiana Code of Evidence art. 408(A); Louisiana Industries, Inc. v. Gibbens Brothers Construction Co., 144 So.2d 630 (La.App. 4th Cir.1962); Broussard v. State Farm Mutual Automobile Insurance Company, 188 So.2d 111 (La.App. 3rd Cir.1966).
DKS also claims that because two employees of Fidelity, who it characterizes as witnesses, were present at the hearing but were not called by the bank as witnesses, a presumption exists that their testimony would have been adverse to Fidelity. We disagree. DKS could have called the two witnesses if it wished. This court has held that the presumption does not apply when the witness in question is equally available to both parties. Hernandez v. Schwegmann Giant Supermarkets, 464 So.2d 902 (La.App. 4th Cir.1985); Barley v. State, through Department of Highways, 463 So.2d 689 (La.App. 4th Cir.1985).
There is no dispute as to when the check was deposited for purposes of determining the bank’s midnight deadline. It was deposited in the DKS notarial account on Friday, November 2, 1984. There is no dispute that Fidelity was required, under La.R.S. 10:4-301(l)(a), to return the check by sending or delivering it to DKS, or pursuant to DKS’s instructions, by midnight on Monday, November 5th. No argument is made that written notice under R.S. 10:4-301(l)(b), without the check itself, would have been sufficient. This is because there is no evidence that the check was being held for protest or was otherwise unavailable for return. See Reynolds v. Wilson Lumber Co. v. Peoples National Bank, 699 P.2d 146 (Okla.1985); Northwestern National Insurance Company of Milwaukee v. Midland National Bank, 96 Wis.2d 155, 292 N.W.2d 591 (1980).
The dispositive issue on appeal is whether the check was sent or delivered by Fidelity to DKS by midnight of November 5th.
La.R.S. 10:1-201 defines “send”, in pertinent part, as meaning “to deposit in the *995 mail or deliver for transmission by any other usual means of communication....”
Testimony before the Commissioner established that a “box” in the commercial loan department at Fidelity was used for the transmission of documents between the bank and DKS. Judy Heckel was a Senior Vice President and cashier. Her duties included overseeing the operation of the bank and the handling of overdraft items. She testified that DKS had several accounts at Fidelity, including the notarial account. DKS also performed legal work for the bank. Ms. Heckel stated that people from DKS were “in our bank on a daily basis,” mostly for making deposits. Because of the frequency of these visits, she stated, “they brought things to us and we sent things back to them instead of using regular mail.” She testified that anything going to the DKS office would be placed for them in the box at the commercial loan department to be picked up.
Ms. Heckel testified that the decision was made on Monday, November 5th, to return and charge back the Crochet check to DKS because the Crochet account had insufficient funds to cover it. She further stated that the same day, the check itself was returned to the Slidell office from processing in Metairie, and placed in the DKS box at the commercial loan department along with a debit notice for the amount of the check.
On cross-examination Ms. Heckel was questioned as to what type of documents were usually put in the commercial loan department for DKS employees to pick up. She answered, “Any correspondence we would have. Sometimes it would be in payment of their bill, sometimes it would be paperwork having to do with a mortgage closing.” She also stated that paperwork dealing with the collection work that DKS performed for the bank would be left there, as well as some of the “heavy bank statements.” The monthly bank statements were normally mailed to the DKS New Orleans office from Metairie, where the bookeeping was done on a contract basis by the Bank of Louisiana.
Johnny Crow was employed by Fidelity as a Senior Vice President. He said that the bank and DKS used the commercial loan department instead of the mail. Items sent to DKS by the bank were dropped off at the commercial loan department window to be picked up, and DKS dropped off items for the bank at the same window.
Charles B. Faler, Jr. was employed by Fidelity as Executive Vice President and later, President, during the years 1977 to 1984. He stated that the bank communicated with DKS by means of a courier. He also stated that he had never known of a check being returned to DKS by a courier.
Gladys Scott was formerly a manager of the DKS Slidell office and was employed in November, 1984. She testified that correspondence and information relating to the firm’s bank account was “always directed to our [DKS] main office in New Orleans.” This included bank statements, which she said she never received at the Slidell office. She also said that she had never received checks that had been returned to DKS or charged back to a DKS account, except the Crochet check in question, which she received “several days” after “all this took place.” Evidence was introduced at the hearing that in August and February, 1984, two other Crochet checks were returned and charged back to the DKS account. Ms. Scott testified that she had not received notice of these charge backs.
Diana Fourcade had been employed by DKS for fourteen and a half years at the time of the hearing. She worked in the New Orleans office and said she received most all of the correspondence from the bank and forwarded it to the employee who was responsible. She took all returned checks and called Gladys Scott for advice on how to handle them. Ms. Fourcade could not recall the Crochet check; she never received notice of the charge back by mail, and was never contacted by anyone at Fidelity regarding the check.
Kyle Martin reconciled bank statements for DKS, including the notarial account with Fidelity, at the DKS New Orleans office. He did not receive any notice of the Crochet check problem. He stated that in *996 other instances involving charged back cheeks he would find out about them when he received “the bank statement or a little bit before, something like that.”
Patrick J. Berrigan, the resident partner in the DKS Slidell office, testified that he did not learn about the charge back of the amount of the Crochet check until November 8th. He said that he was in the bank daily from October 31st through the first two or three weeks of November, but no one ever mentioned anything about the problem. He said that he never requested Fidelity to use any special procedures for notification or return of items charged back to their account. He stated that their banking business was “very separate" from their representing the bank as counsel. He emphatically stated that there was never an understanding that any notices for DKS banking business would be sent through a box at the commercial loan department window. In fact, Berrigan testified that he was not personally aware of the box, and didn’t even know where the commercial loan window was located in the bank. He did not deny the existence of the box, though, and said that DKS personnel would make deposits and pick up work at the bank.
The report of the Commission,er was based upon this evidence. Though it is clear that the report favors Fidelity, the precise reason for that result is unclear. However, we are bound to render any judgment which is just, legal, and proper upon the record on appeal. La.C.C.P. art. 2164.
In its brief on appeal Fidelity claims that the Commissioner found that because of the attorney-client relationship between the parties, the midnight deadline rule did not apply. We find no support for the assertion that this was a finding of the Commissioner, or that this is the law. Under the facts of the case at bar, the cases cited by Fidelity are not authority for such a view. The evidence shows that the attorney-client relationship was sufficiently attenuated from the bank-customer relationship so as to allow DKS the same rights under La.R.S. 10:4-301 and 10:4-302 as any other customer. A different result might be warranted if there was evidence that DKS regularly advised Fidelity employees on banking law, and gave them incorrect advice on this particular subject. However, the record furnishes no such evidence.
Although there were two different relationships involved, based upon the record evidence, we find that the box in the commercial loan department served as a proper place for delivery of the returned Crochet check for transmission to DKS.
Ms. Heckel testified that DKS employees were in the bank on a “daily basis.” Mr. Berrigan himself testified that he was in the bank on a daily basis during the period of time in question. The parties had devised this means of sending documents by placing them in the box instead of using the mail. This method of communicating had apparently been in use for a considerable period of time. Ms. Heckel testified that bank statements, albeit heavy ones, had been transmitted to DKS on previous occasions using the box.
Even though two previous charge backs and returned Crochet checks had been sent to the DKS office in New Orleans, based upon the facts and circumstances in this case we feel that placing the check in the box was a reasonable means of transmitting it to the law firm of Deutsch, Kerrigan & Stiles. Although she did not say exactly when she received the check back, Ms. Scott testified that she did receive it. Under La.R.S. 10:4-301 and R.S. 10:4-201 we find that Fidelity “returned” the check, that is, “sent” it by “delivering” it to the box in the commercial loan department for “transmission” by one of the “usual means of communication" between the parties.
DKS cites a rule of law allegedly in its favor. It claims that where the unsupported testimony of the plaintiff is contradicted by the testimony of the defendants, the credibility of neither is attacked, and there have been no corroborating circumstances or evidence, the plaintiff is held not to have made out his case. In the instant case DKS offered no evidence to contradict the testimony of Judy Heckel that the check was placed in the box at the commer *997 cial loan window on November 5th, before the bank’s midnight deadline. There being no contradictory evidence offered by the defendant, the principal has no application to the facts of the instant case.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.